v. Securities and Exchange Commission I don't want to mischaracterize his testimony, but I thought his testimony was, he knew that the SEC was inquiring and doing things, but he also knew that there weren't charges. And it was his opinion that until those charges were filed, you couldn't answer the question. And you're relying on his testimony. Well, yes, he was the only person. Max Savinelli had nothing to do with that. So whatever he says. Those last two charges on Morningstar only relate to the firm. But the other eight charges are what brings in the permanent bar on Max Savinelli and relate to the advertisements. And once again, I think from a materiality, this court has stated when it did its Morgan-Keegan case and did the analysis and went through the Supreme Court decisions, one of the things that this court stated was, inciting merchant capital was, is that when you look at materiality, you have to look at all of the information that is available to our reasonable hypothetical investor. And our argument in this case is, because the investment decision hadn't been made, you don't make the investment decision until you sign up, if you now say, okay, what was on the buffet table for a prospective investor to look at who had looked at the ad? Well, there was testimony that we sent out a package of information. The Commission seems to dispute whether or not that was, what was in the package of information. But there's no dispute that we sent a GIFS-compliant presentation to every prospective investor. But the Commission's position is, well, yeah, you gave them the information that should have been in the advertisement, but because you gave it to the investor at an advanced stage, it doesn't count. Now, to me... I don't want to spend all our time on this Morningstar thing, but the testimony from Mr. Bockel, if I'm saying his name correctly, about the Morningstar newsletter, as I... Maybe I have this wrong. That's my question. Is this what he testified to? He said the reason why he didn't go back and change the box on the Morningstar form was because whenever we got a new letter from the SEC, we would have a meeting and it was downplayed as being anything significant, and so the box wasn't changed. Yes, Your Honor. He did testify to that. And that's not exactly what you're saying now. But in his testimony, he also stated, though, that... He didn't have a date of a... He didn't have a charge. Okay. And I needed a charge. But, again, Max Zavinelli is not part of the Morningstar issue, but going back to those other eight advertisements, because the Commission's other argument was, okay, well, you withheld your performance on your benchmarks in the fall of 2008 ads. And he said because... And you withheld that because it would have shown poor performance. Well, the reality is that we had evidence to introduce that, look, we would send off, if anybody inquired, and we used the August email, showing that we were underperforming. The information on our website showed that we were underperforming. And if you responded to it, we were also going to provide you with a GIPS compliant presentation. So the question would become, if you're being transparent, why would you possibly withhold this information? Zavinelli's testimony was, I had previously been advertising in 2007 and 2008, and I was following the GIPS format. But when this one came up, the formatter called me and said, and he wasn't involved in the ad, this was Bauschel and the marketing guy, the formatter said, it's too long. And he said, do you want me to chop the footnote? He said, no, don't chop the footnote and just run it. And he wasn't even aware of what was in that ad until it happened. At the end of the day, the firm tried to be transparent. And what's interesting is that when we go to the 2011 ads, those three ads, which were reprints, well, now the omitted information, and the testimony was we couldn't put it in there because it wasn't calculated the same way. But if the omitted information had been provided, that would have shown that we were crushing the benchmarks. And there would be no reason for us to withhold that information other than the fact we were doing a reprint. The two newsletters I'll just touch on very, very briefly, which are six print ads and the two newsletters. The one newsletter in April isn't really even talking about the GIFs. It's doing an uptick and showing 40% losses. The second newsletter specifically says it's not GIFs compliant. And how... Pretty extensively. I mean, several times. The December newsletter. Yes. Thank you. Good morning. May it please the Court, Emily Rosen for the Securities and Exchange Commission. The Advisors Act imposes fiduciary duties on registered investment advisors who investors trust to manage their money and must be scrupulously honest in doing so. Indeed, the Supreme Court has said that investment advisors are charged with the duty of utmost good faith and full and fair disclosure of all material facts, as well as the obligation to employ reasonable care to avoid misleading their clients. This case is about an investment advisor and its principal who lied to its fiduciary clients and prospective clients, who lied about being in compliance with the industry gold standard when it wasn't, who lied repeatedly with full knowledge that it was lying. Indeed, the evidence showed that Mr. Zavanelli was told before the first ads issue ran that they were not in compliance, but he chose to run them anyways. Then he was told by Ashland, their verifiers, who he pays to advise on these issues, that he was not in compliance, and he lied and ran the newsletters and the subsequent ads anyways. Then he was told by the Commission after an exam, again, that these ads were not in compliance, and yet he runs the 2011 ads anyways after promising the Commission that this issue would be fixed, and indeed after his number two had given investigative testimony in this very matter. Patricia? You're an expert on these cases, but my understanding of this record is there really weren't any financial losses for any investors that are part of the evidence in this case. Is that right? It is correct that the Commission did not, the division did not prove any investor losses because it was simply not required. Reliance is not an element of the offense. I know, but I guess what I'm asking about is the penalty. I mean, it's almost $800,000, right? I mean, between the two, the person and the entity. I mean, is that kind of par for the course in these cases, even where there are no demonstrated losses? Your Honor, there are cases, and the Commission cites several, and we cite several in our brief where investor loss, the fact that there is no proof of investor losses does not mean that there can be no bar or no penalties. And the Commission made a specific factual finding that to the extent there was no specific harm to investors proved, that was mitigated by the egregiousness of the offense and the scienter and things here. And so they made that specific determination. And we cite a case such as Kornman where there was no investor losses directly proven, and that was not an impediment to a bar here. So I think on these facts, the Commission found that there was no specific investor harm, but there was harm to the investors at large, and the Commission made that specific, to the investing community at large, and the Commission made that specific factual finding. Can I ask you about what I think is the weakest part of your case? Probably what you, exactly what you don't want to talk about. And that is the December newsletter. Yes. So I've got it in front of me. And, you know, there's what, six words, all numbers are GIPS compliant. I guess that's five words, not a good copy here. On page three. And then on page four, I mean, they just go on and on and on. Not boilerplate language. It says the investment report you're reading is not GIPS compliant. It was never intended to be, nor can it be. You know, it says it again. You know, our report remains not GIPS compliant. At the bottom of the page, these GIPS tables are misleading since they don't go back prior to 2001. I mean, it explains in several different ways that the numbers that are in the newsletter are not GIPS compliant. I just, I don't see how that, I mean, defeats, I don't see how you went on materiality on that. I mean, with all of those kind of warnings. Sure. So let me try to address your question, Judge Martin. I think it's important when you look at the December report. First of all, this was an argument that was considered by the commission. They made detailed factual findings on this very argument. And they're supported by substantial evidence. I think if you look first on page three, which you referenced, that's where the claim of GIPS compliance is. It says all numbers are GIPS compliant. And that's in specific reference to those performance returns that are on that page there. When you look at page four and they're saying this report is not GIPS compliant, they're talking about something else. They're talking about how the timing is such that they can't make them, you know, GIPS compliant. But they're not talking about the issue that was misleading here. The returns on page three are not GIPS compliant because they don't, that's a claim of GIPS compliance, but they don't have the required returns. There's nothing on page four that speaks to that fundamental deficiency. And there's also extensive testimony in the record from Feliz that you can't have this partial claim of GIPS compliance. If you say, you know, if there's, and she said it would be misleading to have this claim of GIPS compliance on page three and not on page four. And that's exactly what the Commission found, that you can't have the benefit of claiming these performance returns are GIPS compliant on page three and then later say something about this report is not GIPS compliant. Investors would have been confused and misled because the guidelines are very clear that you can't have partial GIPS compliance. And the Commission made those specific findings based on Feliz's testimony and on the guidelines and on the facts of the report here. Can I just, I haven't had the benefit of my colleagues' wisdom about that. And, you know, they may talk me into agreeing with you, although I'm not sure I do right now, just to be candid. And so the penalties against Mr. Zavanelli were set out per violation. And I believe the penalty for the December newsletter was $75,000. So if we were to decide against you on that, I'm assuming that we as a Court of Appeals could just subtract out the $75,000 penalty, assuming everything else stays in place. I mean, we wouldn't need to remand for that, would we? If it's on that very specific violation, it's clear it can be tied to that, then I would agree that you would not need to remand in that case. But then my question goes on to the company. That penalty was just one penalty. It wasn't broken down per violation. So would the case need to be remanded on that? I don't believe that you would have to remand, Your Honor, because I believe that because there was just the penalty was two-thirds of the maximum, there's still substantial evidence in the record to support that penalty, even if you take out that one December 2009 violation. But if there's any question, you know, you could remand it to the Commission to ensure that they would give the same penalty. All right. Thank you. There seems to be some reference in the record to Mr. Zavanelli firing Mr. Boschow in retaliation for his testimony. Did the Commission make a specific finding on that issue, and does that play a role at all in either the sanction or the Commission's disposition of this case? The Commission found that there was testimony in the record that that was certainly one of the reasons that Boschow was fired. I don't believe the Commission made any finding that it was the sole reason, and it did not refer to that incident in any of the penalty discussion. I don't believe it played a role in the penalty determination, but it was a fact that the Commission relied on in its overall analysis. I wanted to just address the Morningstar report because there was some colloquy on that, the Morningstar reports. I think it's important for this court to not be confused between the inputs and the outputs. The outputs, which is what went to clients in the Morningstar reports, said very clearly, pending SEC investigations, no. There's no charges or anything like that. And it's important to know that the record shows that Boschow knew that that's what these reports that were going to clients said, pending SEC investigations, no. And he knew that was false. You know, he had from the letter from the Commission, and then from undergoing investigative testimony, where the Commission examiner specifically told him that ZPR was under Commission investigation. So there's no misunderstanding. And Judge Martin accurately described his testimony. He said that the simple reason he didn't correct it is because he didn't feel that it was an official investigation until the OIP was issued, because every time these letters came in, they downplayed it. But this parsing of the form, the inputs, is both, A, something that Zabinelli advanced, not Boschow, and B, simply irrelevant to the question, even if the forms had said charges and Boschow had thought of that. He knew what the output said, and the outputs are what is misleading. The Flannery case from the First Circuit, doesn't that stand for the proposition that information investors could access after seeing a misrepresentation could prevent the misrepresentation from being material? How do you respond to that? Yes, Your Honor. I believe the Flannery case stands for the proposition that such after-provided information could be relevant. That's the word from Flannery. But the Flannery case is very different from the case we have here for several reasons that we talked about. First of all, I think it's important to note that nothing on the website or in any materials that the investors got at any stage spoke to the affirmative misrepresentation in this case. The affirmative misrepresentation that was charged in this case was that ZPR was GIPS compliant. Nothing on the website said, hey, is it GIPS compliant? Nothing after-provided information said we're not GIPS compliant. And so there's simply no correction or cure in the after-provided information for the fundamental misrepresentation here. Do you disagree that the website and the materials that were sent out were GIPS compliant? I believe that there is some testimony that there were GIPS compliant returns on the website and that eventually at the late stage some investors got a GIPS compliant presentation, but that's different from the information that's required by the advertising returns. The GIPS compliant presentation is a separate requirement in the guidelines. The advertising requirements are very specific as to what is to be provided, and it is not necessarily the case that that information was provided on the website or in the GIPS compliant presentation, and certainly not in a format that investors could easily identify that they were given missing information and that, in fact, they would then also have to go the additional step of realizing, oh, I'm missing these returns, and that means they were GIPS compliant. So there's simply no correction. And then back to the Flannery question, it's also different because, again, there you have a case where the slide says typical, and so there was expert testimony in the record in Flannery that an investor would do due diligence and follow up and wouldn't stop at that slide, whereas here you have the precise opposite situation. You have an advertisement, and advertisements are very important in the investment advisor scheme. They're the first point of contact with investors. You have an advertisement that says we're GIPS compliant, and that is a signal to investors that they don't have to look behind that to find these other returns that may be buried on the website or in other materials. That representation comes with the representation that these certain returns are provided, and so it's the exact sort of opposite case that you have. And finally, on Flannery, the last thing I'd say is that in Flannery, while the discussion was about materiality, they said that materiality was thin, but they actually kicked the case as to that particular defendant on Sienter because Sienter was so thin. Here you have extensive evidence of Sienter. Again, you have testimony that Zavanelli was told by Bauschel these ads are not compliant. He runs them anyways. He does that at a time where returns have fallen to concealed poor returns, and then again he's told by Ashland  He runs them anyways. He's told by the commission you have this problem with your advertising in the exam. He runs the 2011 ads anyways. So you have extensive evidence of Sienter, and it just shows the great lengths that ZPR would go to keep this claim of GIPS compliance in because it was so important to investors, which again is very different than the situation you have in Flannery. Unless the court has any further questions, the commission would rest on its papers. I think we're good. Thank you. Just to clarify a few things that obviously the court raised. It's true. There were no financial losses. No person in the public was ever harmed by these advertisements. As a matter of fact, there was testimony that these advertisements were an absolute disaster and that they just didn't work to bring in any assets. This is not a world I live in, so I just was curious about whether these penalties were kind of in line with what you see in cases where there are no financial losses. Well, and I think the court is focusing on something that is probably appropriate, which is that this is a permanent bar by this individual, and there has been not one ounce of harm to the investing public. It didn't line its pockets with any money, either did the firm. And that's part of our whole contention is that this whole penalty of the permanent bar and these huge fines for when you look at the conduct in question, we just don't believe it should be warranted. We conceded in our brief. We conceded in our brief. We knew we were a gifts-compliant firm, and we knew ultimately that the ads didn't comply, those eight ads and the two newsletters. But Mr. Zabinelli would not concede that, as I understand. And that seemed to be the rub here is that in spite of the fact that Ashwin Partners resigned, in spite of the fact that they said you weren't gifts-compliant, in spite of the fact SEC says you weren't gifts-compliant, in spite of the fact you say they weren't gifts-compliant, he said we were and we never did anything wrong. Unfortunately, my client is not here today. But, I mean, isn't that the rub here? He would never admit that he did anything wrong. What the rub with him was is he kept saying to himself, I've complied with all of the gifts standards. I've been verified. So when it says we make a claim that we comply with the gifts standards, in his mind it's true. We did. But at one point he said, once he got the letter from the SEC, he said, okay, my bad, we'll fix it. He did. He did. 2009, when he said I'm going to be a good boy and I'm going to make sure we comply with gifts, you'll recall in the record we started to advertise again. And we started to advertise, and the commission found that those advertisements that were run, starting in December of 2009 through 2010, complied with gifts. Now, the bone of contention that came up was the reprint on those three reprint ads. And as he said, I couldn't make them gifts-compliant because they told me I couldn't change, you know, what they said in the ads. And so he said, I was just reprinting them, you know. But I know there's a point. There's a point in time that, but I would still suggest to the court, that's why we argued there's an argument that the firm was negligent on those eight violations, but not doing it intentionally. But that assumes, too, you have to, you've already concluded its material. Thank you. Thank you. We appreciate the presentation. That concludes this case. All right, so we'll, are you okay? Yeah, I'm fine. We'll hear the case of D.Z. Bank versus